AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Megan DeMarco (312) 371-5698

**FILED**
10/9/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JEROME BOYKIN

CASE NUMBER:   21 CR 636
**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about October 8, 2021, at Joliet, in the Northern District of Illinois, Eastern Division, the defendant
violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 924(c)(1)(A) | JEROME BOYKIN, defendant herein, knowingly possessed a firearm in furtherance of a drug-trafficking crime for which defendant may be prosecuted in court of the United States, namely, attempted possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

_____

CHRISTOPHER LABNO
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 9, 2021

_____
*Judge's signature*

City and state: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, CHRISTOPHER LABNO, being duly sworn, state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed for approximately twenty years. I am currently assigned to the Chicago Field Office, Organized Crime Drug Enforcement Task Force—Chicago I Enforcement Group.

2.      My responsibilities include the investigation of violations of law as they relate to federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms trafficking, violent crime, and narcotics trafficking. I employ various investigative tools such as the use of informants and witnesses, surveillance, controlled purchases of firearms and narcotics, firearms traces, telephone toll analysis, and the execution of both search warrants and arrests warrants.  As an ATF Special Agent, I have been involved in the investigations of numerous firearms offenses, violent crimes and drug trafficking offenses.  I have also been the affiant for multiple search warrants, pen registers and court orders.

3.      This affidavit is submitted in support of a criminal complaint alleging that Jerome BOYKIN has violated Title 18, United States Code, Section 924(a)(1)(C). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BOYKIN with firearms trafficking, I have not included each and every fact known to me concerning this

investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, interviews of witnesses, and review of audio/video evidence.

## I.     FACTS ESTABLISHING PROBABLE CAUSE

### *Summary*

5.     In or around September 2021, law enforcement began investigating a firearms-trafficking conspiracy in the Chicago area. As described in more detail below, the scheme worked as follows: Jerome BOYKIN brought firearms from St. Louis, Missouri to Chicago. BOYKIN then gave the firearms to an individual who recently became a law enforcement confidential source ("CS-2").[1] Before CS-2 began cooperating, CS-2 would give BOYKIN high-end marijuana in return for the firearms. CS-2 would then sell the firearms through a middleman.

6.     From on or about September 29, 2021 to October 8, 2021, at law enforcement's direction, CS-2 placed recorded Facetime and voice calls to BOYKIN to coordinate the trade of approximately six pounds of marijuana for 20 firearms.  On

---

[1] CS-2 is cooperating in the hope of receiving credit in a pending firearm case. On or about September 23, 2021, Chicago Police Department ("CPD") officers stopped CS-2 and recovered a Glock 43x semi-automatic 9 mm pistol. CS-2 was under indictment in a felony narcotics case in the Circuit Court of Will County and was prohibited from having a firearm. CS-2 agreed to cooperate and consented to a search of his cell phone. No promises have been made to CS-2.

or about October 8, 2021 at approximately 12:30 p.m., BOYKIN met up with CS-2 and undercover agents ("UC") who were wearing audio/video recording equipment. BOYKIN gave CS-2 and UC agents 22 firearms in exchange for approximately six pounds of marijuana and various marijuana products. BOYKIN was taken into custody.

### Background of the Investigation

7.      On or about September 29, 2021, law enforcement met with an ATF confidential source (CS-2) about CS-2's role in a firearms trafficking conspiracy. In a recorded interview, CS-2 related the following in summary, not verbatim.

a.      Approximately two to three years ago, CS-2 met a man he knew as "Jerry," later identified as Jerome BOYKIN,[2] through Facebook groups selling specialty sneakers. Approximately one year ago, CS-2 posted a photo of marijuana on Facebook, and BOYKIN asked CS-2 via Facebook messenger if CS-2 could get large quantities of marijuana. CS-2 sent BOYKIN pictures over Snapchat of large quantities of marijuana. BOYKIN asked to trade firearms for the marijuana.

b.      BOYKIN typically travels from St. Louis, Missouri to Chicago to trade the guns for marijuana. All previous transactions have taken place in residential garages in Chicago. According to CS-2, the first time BOYKIN and CS-2

---

[2] Agents presented a photo of BOYKIN to CS-2, and CS-2 identified the photo as the person CS-2 knew as Jerry. Additionally, agents identified BOYKIN by searching the cell phone number that CS-2 provided for "Jerry" through a commercial database. Records show that the number is associated with BOYKIN.

exchanged guns for marijuana, in or around October 2020, BOYKIN gave CS-2 two firearms for "half a pound, some pre-rolls,[3] and like other shit."

      c.     CS-2 related that, over the past year, he had exchanged marijuana for guns with BOYKIN at least ten times, and had obtained approximately 40 to 50 firearms from BOYKIN. According to CS-2, a typical trade was three firearms for every pound of high-end marijuana. CS-2 relayed that the firearms were all new and always came in a box. CS-2 believed the firearms had never been fired.

      d.     According to CS-2, the next deal with BOYKIN was to be four to five pounds of marijuana in return for twelve to thirteen firearms.

**September 29, 2021: CS-2 and BOYKIN Arrange Guns-for-Drugs Exchange**

      8.     On or about September 29, 2021, at approximately 7:27 p.m., CS-2 called BOYKIN over Facetime in the presence of law enforcement at (314) 296-8878 ("Boykin Phone").[4] Law enforcement recorded the call.[5] The call took place in your affiant's undercover vehicle; your affiant was able to hear and observe the entire call.[6]

---

[3] Based on my training and experience, "pre-rolls" are a street slang term for pre-rolled marijuana cigarettes or cigarillos.

[4] Agents identified the phone as BOYKIN's by running the number through a commercial database, which shows that the phone number is associated with BOYKIN in commercial databases. Further, law enforcement could observe BOYKIN over Facetime during the recorded call. Law enforcement compared observations of BOYKIN on Facetime to

[5] This investigation included the use of consensually recorded phone calls and text messages. The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. The summaries do not include references to all statements made by the speakers on the topics that are described by the speakers.

[6] Agents compared their view of BOYKIN on the Facetime call to a Missouri Driver's License photo of BOYKIN. They appeared to be the same person.

9. As observed by agents, CS-2 told BOYKIN that CS-2's contacts were going to California the following day to pick up marijuana, and that the marijuana would be better. CS-2 apologized for the delay, and BOYKIN responded, "I don't need to rush out there I can take my time."

10. CS-2 stated that once CS-2's contact returned from California, CS-2 would have access to the pre-rolls and strands of marijuana BOYKIN wanted. BOYKIN stated that he was concerned about the quality of the marijuana CS-2 gave BOYKIN in their last deal, and CS-2 assured BOYKIN that "the packs would be better." BOYKIN again stated that he would wait for the right quality, and was not in a rush.

11. BOYKIN asked CS-2 whether he should "stop where I'm at" or "grab more [firearms]?" BOYKIN stated that "this weekend we got a fat ass gun show," and that BOYKIN's contact, an "old white man" would likely "hit me up like Monday, talking about, 'Hey Jerry, I got some more [firearms] to check out.'" BOYKIN said he would "probably just stick to Glocks [pistols], I wouldn't change up the formula like that." BOYKIN further stated, "just wondering if I should grab more, or is there a max? Cause I'm gonna want a hundred pre-rolls [pre-rolled marijuana cigarettes]." CS-2 explained that BOYKIN would need more guns because of the pre-rolls.

12. Based on my training and experience and the training and experience of other agents, BOYKIN and CS-2 were negotiating how many firearms BOYKIN needed to bring in order to obtain the volume of marijuana and marijuana products that BOYKIN wanted.

13.     BOYKIN then asked CS-2 whether he had access to "carts." Based on my training and experience and the training and experience of other agents, BOYKIN was referring to marijuana or THC cartridges for vape pens. CS-2 stated that CS-2 would put in an order for carts.

14.     BOYKIN explained that he had sold some marijuana to "this chick," who had referred him to a new customer, a "42-year-old white lady" with four kids who "basically sells them to the other moms." BOYKIN stated that the new customer wanted 40 carts and would buy approximately 30 carts a month.

15.     Based on my training and experience and the training and experience of other agents, BOYKIN intended to re-sell or distribute the marijuana that he planned to receive from CS-2 in exchange for guns.

### October 6, 2021-October 7, 2021: CS-2 and BOYKIN Discuss Guns-for-Drugs Exchange

16.     On or about October 6, 2021, at approximately 5:12 p.m., CS-2 Facetimed BOYKIN in the presence of law enforcement at Boykin Phone. The call took place in your affiant's undercover vehicle; your affiant was able to hear and observe the entire call.

17.     During the recorded call, the following conversation occurred:

        a.     CS-2 told BOYKIN that he was about to "go look at the work" (marijuana) and asked BOYKIN how many "units" (pounds of marijuana) BOYKIN wanted. BOYKIN said he wanted six pounds and "a bunch of pre-rolls." BOYKIN said he thought he had 20 firearms, then stated, "I could possible (*sic*) bring you my 26 [Glock 26] cause I have 21 [firearms], but yeah hold on … I think I have 14 plus seven,

I got 20, 21 so I know I got 20 so that's six times three that's 18 [firearms] and I got two straps [firearms] I can work out for some pre-rolls."

b.      BOYKIN asked CS-2 if CS-2 had "carts" (marijuana or THC cartridges for vape pens). CS-2 said he had "carts," and BOYKIN said he might need 200 carts for one of his customers. BOYKIN asked what CS-2 would charge for 100 pre-rolls and 100 carts, and CS-2 responded, "Depends but I'm like lookin' at like three" (firearms). CS-2 and BOYKIN continued to negotiate the price.

c.      CS-2 told BOYKIN not to bring him any "bullshit" firearms, like the "Tauruses" that BOYKIN brought last time. BOYKIN responded, "Well okay, look I don't got no Taurses this time."

d.      CS-2 told BOYKIN that BOYKIN could sample the marijuana and trade for exactly what BOYKIN wanted. The call ended with CS-2 stating that CS-2 would call back with the exact time CS-2 wanted to meet the next day.

18.     At approximately 5:28 p.m., CS-2 again Facetimed BOYKIN in the presence of law enforcement. During the recorded call, the following conversation occurred:

a.      CS-2 and BOYKIN discussed what time to meet the next day. They then continued to negotiate the specifics of the deal. For example, BOYKIN offered to give CS-2 "three straps" (firearms) for pre-rolls and carts. CS-2 responded that CS-2 could "throw in some personal," but "nothing too crazy." BOYKIN responded, "I might have to do that cause I know if I give you three straps [firearms] one of them is gonna probable by that 26(Glock 26)".

b.      BOYKIN stated that he had another supplier of marijuana in Missouri who was selling to individuals in Chicago. CS-2 reassured BOYKIN that CS-2's product was better.

c.      BOYKIN again mentioned one of his female customers, explaining that "this bitch" was buying large quantities of carts, including about 60 carts in the last week. BOYKIN said she was "rollin' that shit to her customer base." Because of this new customer, BOYKIN said he needed approximately 200 carts. CS-2 assured BOYKIN that CS-2 could supply BOYKIN with the carts needed.

d.      BOYKIN said he would call CS-2 back to go over the list of firearms for the deal. BOYKIN stated, "I know I got ten Glock 22s." BOYKIN continued, "Like seven of them bitches is crazy like I don't know how dude got them, but seven of these bitches are like limited edition." BOYKIN further stated, "I know I got ten of those, I got a 48, 43, 43x, 19, couple 17s, a 21 you know what I'm sayin' [types of firearms]." In my training and experience and the training and experience of other law enforcement officers, BOYKIN was describing to CS-2 the different types of Glock semi-automatic pistols he had in his inventory.

e.      BOYKIN said he would be willing to pick up additional Glocks from "an old white dude" if CS-2 had the product to trade. CS-2 assured BOYKIN CS-2 would have plenty of product for BOYKIN. BOYKIN said he had 21 guns and would try to grab three more.

f.      CS-2 asked BOYKIN if all the guns would come in boxes. BOYKIN replied that all but two of them should have boxes, and he was going to get

8

additional boxes from the gun store. BOYKIN explained that the "old white dude" gave him seven Glocks without boxes. CS-2 said two Glocks without boxes would not be an issue.

g.     CS-2 and BOYKIN both said they wanted to make sure everyone made money off the deal. BOYKIN said he had just pulled into the gun store to pick up gun cases. CS-2 and BOYKIN agreed to speak soon.

19.     Later that same day, in a series of recorded and unrecorded Facetime calls, CS-2 and BOYKIN spoke and decided to postpone the transaction until October 8, 2021, so BOYKIN could obtain several other firearms from his gun supplier and bring those extra guns to trade for marijuana.

20.     On or about October 7, 2021 at approximately 2:48 p.m., CS-2 Facetimed BOYKIN at Boykin Phone in the presence of law enforcement. During the recorded call, the following conversation occurred:

a.     CS-2 asked if everything was good for the transaction on Friday, October 9. CS-2 said he would send an address to meet up.

b.     CS-2 asked BOYKIN if BOYKIN had been able to get additional firearms, and BOYKIN said he had texted his source but hadn't heard back.

c.     CS-2 asked BOYKIN which firearms he would bring for their trade. BOYKIN said he would bring his personal Glock 26 semi-automatic pistol. He also said he would bring ten Glock 22 semi-automatic pistols; one Glock 43 semi-automatic pistol; one Glock 43x semi-automatic pistol; one Glock 48 semi-automatic pistol; one Glock 19 semi-automatic pistol; two Glock 17 semi-automatic pistols; two

9

CZ pistols with threaded barrels ready for a suppressor; and one Springfield Armory Hellcat semi-automatic pistol. BOYKIN continued, "I don't know if I just listed seventeen, but I know I got seventeen Glocks." He added, "Out of 21 straps (firearms) I got 18 Glocks, two of them are the CZs one of them is the Hellcat so I got 21 in total right now."

       d.    BOYKIN said he would call his source once BOYKIN was off the phone with CS-2. BOYKIN added, "He told me he had three Glocks plus that 29" (a Glock 29). BOYKIN said his source "said he was holding it for somebody, I'm like fuck that bro I want that 29." CS-2 told BOYKIN to get the Glock 29.

       e.    BOYKIN told CS-2 that BOYKIN would arrive around 12 or 12:30. CS-2 said he would confirm the time later and send the address via text message to BOYKIN.

### *October 8, 2021: BOYKIN Exchanges 21 Firearms for Marijuana*

    21.    On or about October 8, 2021, at approximately 12:45pm, CS-2 and undercover agents met with BOYKIN at an undercover meeting location in the Northern District of Illinois. Before this operation as well as after, agents searched CS-2 was searched for weapons or contraband with negative result. In addition, CS-2 and undercover agents were equipped with disguised audio and video recording devices. CS-2 introduced the undercover agents as CS-2's marijuana suppliers.

    22.    As observed by law enforcement, BOYKIN pulled a plastic tub and several bags containing a total of 22 firearms out of the trunk of his vehicle.

23.     CS-2 and the undercover agents displayed to BOYKIN several different varieties of marijuana and marijuana vape cartridges as well as pre-rolled marijuana cigarettes. BOYKIN pointed out which varieties of marijuana he wanted, picking out and asking for six pounds of specific different strains of marijuana and various marijuana products.

24.     BOYKIN then transferred the approximately 22 firearms (pictured below) to agents and attempted to take possession of the marijuana, which undercover agents purported was in a sealed cardboard container. Undercover agents then gave a pre-arranged arrest signal and BOYKIN was taken into custody.

25.     Agents subsequently advised BOYKIN of his rights, BOYKIN waived his rights and made a statement to Agents. BOYKIN stated, in summary, that he had obtained the 22 firearms from a firearms source in Missouri and that he had trafficked approximately 60 firearms to Chicago in exchange for marijuana in the past six months.



## II. CONCLUSION

22. Based on the foregoing, I believe there is probable cause to believe that, on or about October 8, 2021, BOYKIN possessed a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c).

FURTHER AFFIANT SAYETH NOT.

CHRISTOPHER LABNO
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone October 9, 2021.

Honorable SUSAN E. COX
United States Magistrate Judge